# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mr. Victor Saldana,

        Plaintiff,

v.

Dr. Stephen Crane; MN. Doc; Cathy Reid;
Dr. Paulson; Dr. Steven Moore; St.
Joseph's Hospital; and Corrections Medical
Services, Inc.,

        Defendants.

File No. 12-cv-573 (DWF/TNL)

**REPORT
&
RECOMMENDATION**

---

Victor Saldana, #201423, Minnesota Correctional Facility, 5329 Osgood Avenue North,
Stillwater, MN 55082-1117 (*pro se* Plaintiff);

Andrea Pavelka Hoversten and Charles A. Gross, Geraghty, O'Loughlin & Kenney, PA,
55 East Fifth Street, Suite 1100, St. Paul, MN 55101-1812 (for Defendants Dr. Stephen
Craane[1] and Corrections Medical Services, Inc.);

Margaret E. Jacot, Minnesota Attorney General's Office, 445 Minnesota Street, Suite
900, St. Paul, MN 55101-2127 (for Defendants Kathryn[2] Reid and Dr. David Paulson);
and

Mark R. Whitmore and Jessica L. Klander, Bassford Remele, PA, 33 South Sixth Street,
Suite 3800, Minneapolis, MN 55402-3707 (for Defendants Dr. Steven Moore and St.
Joseph's Hospital).

---

      This matter is before the Court, United States Magistrate Judge Tony N. Leung, on

Defendants Steven Moore, M.D., and St. Joseph's Hospital's Motion to Dismiss Pursuant

to Minn. Stat. § 145.682 (Docket No. 30); Stephen Craane, M.D. and Corizon, Inc. f/k/a

---

[1] While Saldana has spelled Dr. Craane's name with only one "a," it appears from Dr. Craane's submissions that his
name is spelled with two and, therefore, the Court uses this spelling.
[2] It appears from Reid's submissions that her first name is spelled with a "K" rather than a "C" and, therefore, the
Court uses this spelling.

Correctional Medical Services, Inc.'s Motion for Summary Judgment and Statutory Dismissal (Docket No. 44); and Defendants Paulson and Reid's Motion for Summary Judgment (Docket No. 60). These motions have been referred to the undersigned for a report and recommendation to the Honorable Donovan W. Frank, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and Local Rule 72.1.

## I.

Plaintiff Mr. Victor Saldana is presently incarcerated in the Oak Park Heights correctional facility in Stillwater, Minnesota ("Oak Park Heights"). (Compl. ¶ IV.A, Docket No. 1.) Saldana brings this action pursuant to 42 U.S.C. § 1983 for violations of his civil rights based on inadequate medical treatment of a varicocele.[3]

In 2010, Defendant Dr. Stephen Craane, a physician at Oak Park Heights, diagnosed Saldana with varicocele illness. (*Id.*) Saldana alleges that Dr. Craane told him that his only option was to undergo surgery.[4] (*Id.*) Saldana has had three separate surgeries to treat this condition, surgeries which he alleges have caused chronic pain more severe than the condition itself prior to surgery. (*Id.*) Saldana brings the instant action against various individuals involved in his medical care.

---

[3] "A varicocele is a widening of the veins along the cord that holds up a man's testicles (spermatic cord)." *Varicocele*, PubMed Health, Nat'l Center for Biotechnology Info., U.S. Nat'l Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002263/ (last visited June 20, 2013). "A varicocele forms when valves inside the veins along the spermatic cord prevent blood from flowing properly. This causes the blood to back up, leading to swelling and widening of the veins." *Id.* "A varicocele is usually harmless and often does not need to be treated." *Id.*

[4] Such surgery is known as varicocelectomy. *Id.* This is an out-patient procedure during which the patient "receive[s] some type of numbing medication (anesthesia). The urologist will make a cut, usually in the lower abdomen, and tie off the abnormal veins. Blood will now flow around the area into normal veins." *Id.*

## A. Dr. Craane & Corizon

Dr. Craane is a physician employed by Defendant Corizon, formerly known as Correctional Medical Services, Inc.,[5] and provides medical care to prisoners in Minnesota correctional facilities. (Aff. of Stephen Craane, M.D. ¶ 3, Oct. 17, 2012, Docket No. 48.)

### 1. Dr. Craane

Saldana alleges that Dr. Craane failed to inform him about the availability of an alternative procedure known as varicocele embolization.[6] (*Id.*) Saldana contends that Dr. Craane chose not to tell him about varicocele embolization because surgery was a less expensive treatment option for the facility. (*Id.* ¶ IV.A, B.) Alleging that Dr. Craane was deliberately indifferent to his medical needs, Saldana claims

> that the 'deliberate omission' of the 'varicocele embolization' procedure interferes with common sense medical practice, violating the very oath [and] obligation to provide the proper medical treatment without any form of discrimination or causing harm to the health [and] safety to this Plaintiff in violation of his 8th Amendment Right which bans . . . cruel [and] unusual punishment.

(*Id.* ¶ IV.B; *see also id.* ¶ IV.C.)

Saldana also alleges that Dr. Craane was deliberately indifferent to his medical needs when Dr. Craane discontinued certain post-operative prescriptions based on allegations that Saldana was diverting[7] the medication. (*Id.* ¶ IV.C.) Saldana brings

---

[5] Correctional Medical Services, Inc., is now known as Corizon, Inc. (Joint & Separate Answers of Stephen Craane, M.D. and Corizon, Inc. f/k/a Correctional Medical Services, Inc. ¶ II, Docket No. 17; *see also* Mem. of Craane & Corizon in Supp. of Summ. J. at 2 n.1., 35, Docket No. 46.)

[6] Varicocele embolization is also an out-patient procedure, but a smaller cut is used enabling the patient to heal faster. *Id.* "A small hollow tube called a catheter (tube) is placed into a vein in your groin or neck area. Using x-rays as a guide, the health care provider moves the tube into the varicocele. A tiny coil passes through the tube into the varicocele. The coil blocks blood flow to the bad vein, and sends it to normal veins." *Id.*

[7]

these Eighth Amendment claims for deliberate omission of treatment options and withholding medication against Dr. Craane in his individual capacity.

In addition, Saldana alleges that Dr. Craane acted in contravention to generally accepted medical practices in failing to notify Saldana of his treatment options. (*Id.* ¶ IV.B.)

### 2. Corizon

Saldana alleges that Corizon is "solely contracted to provide the basic fundamental treatment of medical needs for incarcerated offenders." (*Id.* ¶ IV.I.) Saldana alleges that Corizon, acting in its individual capacity through its employees, failed to provide such treatment and therefore was deliberately indifferent to his medical needs in violation of the Eighth Amendment. (*Id.*)

## B. Reid, Dr. Paulson & DOC

### 1. Kathyrn Reid

Defendant Kathyrn Reid is the Health Services Administrator for Oak Park Heights. (Mem. in Supp. of Summ. J. of Defs. Paulson & Reid at 1, Docket No. 61-2.) Saldana alleges that, in 2011, Reid was deliberately indifferent to his medical needs when she removed him from "the recovery/hospital unit of the prison" and "placed [him] in a segregated unit with *no medical observation*" due to a need for bed space. (Compl.

---

Diversion is a term used when an offender consciously attempts to use medication for a purpose other than the one intended by the prescribing practitioner. An offender may resist swallowing a pill, attempt to hide it under his tongue, in his cheek, in the palm of his hand, or in his cup, or cough it up so that he may later share it with his friends, use it to barter for goods or services from other offenders, or crush it and snort it.

(Aff. of Kathryn Reid ¶ 5, Nov. 19, 2012, Docket No. 62.)

¶ IV.D.)  Saldana alleges that he "was removed from the very observation required after surgery" and "was still in the early hours of having stiches and was completely helpless and vulnerable."  (*Id.*)

Saldana likewise alleges that Reid was deliberately indifferent to his medical needs by withholding certain post-operative prescriptions from him based on allegations that he was diverting medication.  (*Id.* ¶ IV.E.)

Further, Saldana alleges that Reid was deliberately indifferent to his medical needs by denying his requests to see a doctor until he agreed to have a third surgery.  (*Id.* ¶ IV.F.)  Saldana states that he "continued to request to see the doctor, get something for the on-going pain & swelling."  (*Id.*)  Saldana alleges he "has a low reading and comprehensive [sic] level and has a learning disability" and that Reid only responded after someone from the Mexican consulate called the prison on his behalf.  (*Id.*)

Saldana brings these deliberate-indifference claims against Reid in her individual capacity and contends that Reid's "mistreatment" has caused him to become depressed and seek mental-health treatment.  (*Id.*)

Lastly, Saldana alleges that Reid also acted in contravention to generally accepted medical practices.  (*Id.*)

### 2. Dr. Paulson

Defendant Dr. David Paulson is the Medical Director for the Minnesota Department of Corrections ("DOC").  (Aff. of David Paulson, M.D., M.B.A. ¶ 1, Nov. 26, 2012, Docket No. 63.)  Saldana alleges that Dr. Paulson, acting in his individual capacity, violated Saldana's rights under both the Eighth Amendment and the Religious

Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, by refusing to approve the varicocele embolization procedure. Saldana asserts:

> Now-to hold the position to remove the testic[le] altogether te[e]ters on the edge of (castration) (genocide) or the right to reproduce, a clear interference of the basic sort. 2010, 2011 and to this present filing-the only option Dr. Paulson will approve is the removal of a very important physical component of the [a]natomy-as though to place himself above God in the sense of cloning and uncloning. This is a very dangerous and leth[a]l reality-but clearly this is malpractice combined with cruel and unusual punishment to the highest order.

(*Id.* ¶ IV.G.)

### 3. DOC

Saldana has also named "MN. DOC" as a defendant in this matter. (*See* Compl. (caption), ¶ III.B (listing parties).) As best as this Court is able to tell, Saldana means the DOC. It does not appear, however, that Saldana has made any allegations in his Complaint concerning what the DOC did or failed to do. Rather, each time Saldana uses "MN DOC," it appears to be as a label for individuals he believes are associated with the DOC. (*See* Compl. ¶¶ III.B., IV.A.) Saldana has not made any specific claims against the DOC.

### C. Dr. Moore & St. Joseph's Hospital

#### 1. Dr. Moore

Defendant Dr. Steven Moore performed Saldana's three surgeries. (*Id.* ¶ IV.H.; *see also* Mem. of Dr. Moore & St. Joseph's Hospital in Supp. of Mot. to Dismiss at 1, Docket No. 32.) Saldana alleges that, despite knowing about varicocele embolization,

Dr. Moore chose not to tell Saldana about the procedure. In addition, during a subsequent follow-up appointment, Dr. Moore stated that it appeared Saldana's prostate was causing him trouble, not "'varicocele illness' as previously diagnosed." (*Id.*) Saldana alleges that this "misdiagnosis" contributed to the violations of Saldana's rights under the Eighth Amendment. (*Id.*) Saldana asserts these claims against Dr. Moore in his individual capacity. (*Id.*)

### 2. St. Joseph's Hospital

While Saldana names Defendant St. Joseph's Hospital as a defendant in this matter, his Complaint does not allege what St. Joseph's Hospital did or failed to do.

## II.

The Court begins with Saldana's claims against Dr. Moore and St. Joseph's Hospital. Dr. Moore and St. Joseph's Hospital move for dismissal based on Saldana's failure to comply with Minn. Stat. § 145.682, which requires certification of expert review in the form of an affidavit in actions against health care providers for "malpractice, error, mistake, or failure to cure." Minn. Stat. § 145.682, subd. 2; *see also Broehm v. Mayo Clinic Rochester*, 690 N.W.2d 721, 725 (Minn. 2005). This affidavit certifies that the facts of the case have been reviewed with an expert and, "in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff." Minn. Stat. § 145.682, subd. 3(a). Failure to produce such an affidavit "within 60 days after demand for the affidavit results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case." *Id.*, subd. 6(a).

The expert-review requirement was enacted "as a means of readily identifying meritless lawsuits at an early stage of litigation," and, as a result, courts "have stressed that plaintiffs must adhere to strict compliance with the requirements of Minn. Stat. § 145.682" so as not to undermine its legislative purpose. *Broehm*, 690 N.W.2d at 726. "Noncompliance with the statutory requirements results in dismissal with prejudice." *Id.* at 725; *see also* Minn. Stat. § 145.682, subd. 6 (listing "mandatory dismissal with prejudice" as penalty for noncompliance); *Juetten v. LCA-Vision, Inc.*, 777 N.W.2d 772, 775 (Minn. App. 2010) ("[S]ection 145.682 leaves no room for the district court to exercise discretion.").

Section 145.682's affidavit requirement applies to *medical malpractice* actions. The majority of Saldana's claims, however, have been brought under § 1983 for deliberate indifference to Saldana's medical needs. Nonetheless, the only act that Saldana alleges that Dr. Moore committed was "misdiagnosis," which, in combination with the acts of others, resulted in the violation of Saldana's rights under the Eighth Amendment. (Compl., ¶ IV.H.) Because Saldana only alleges that Dr. Moore erred in the diagnosis of his condition, the Court will treat his claims against Dr. Moore as claims for medical malpractice. *See* Minn. Stat. § 145.682, subd. 2; *see also Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (noting "pro se complaints are to be construed liberally").

Saldana did not file a conventional response to Dr. Moore and St. Joseph's Hospital's motion to dismiss. Saldana did, however, file a document entitled "Answer to Response Brief for Including Motion to Dismiss Dr. Steven Moore, and St. Joseph's Hospital, and Applying for Injunction to Continue Pain Meds" ("Answer to Response

Br.") (Docket No. 21), in response to Dr. Moore and St. Joseph's Hospital's Answer. In this document, Saldana states, among other things, "[w]e would like to reiterate our arguments in [sic] original complaint with the exception of any actualization [sic] against Dr. Steven Moore MD. and St. Joseph's Hospital." (Answer to Response Br. ¶ 1.) Further, Saldana does not dispute Dr. Moore and St. Joseph's Hospital's assertion that he has not complied with Minn. Stat. § 145.682's affidavit requirement.

On May 30, 2012, Dr. Moore and St. Joseph's Hospital demanded that Saldana provide the affidavit of expert review required by Minn. Stat. § 145.682 as part of their Answer to Saldana's Complaint. (Joint & Separate Ans. of Defendants Steven Moore M.D. & St. Joseph's Hospital ¶ 11, Docket No. 13.) To date, over a year later, Saldana has not produced the requisite affidavit. As the Minnesota Court of Appeals previously observed in *Juetten*, "section 145.682 leaves no room for the district court to exercise discretion." 777 N.W.2d at 775. Saldana has not complied with Minn. Stat. § 145.682 and, therefore, this Court recommends that his medical malpractice claims against Dr. Moore be dismissed with prejudice.

With respect to St. Joseph's Hospital, Saldana has failed to plead any facts, let alone sufficient facts, to state a claim for relief. The "short and plain statement" required by Fed. R. Civ. P. 8(a)(2) "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

There must be "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Saldana has done nothing more than list St. Joseph's Hospital as a defendant.

Therefore, this Court recommends that Dr. Moore and St. Joseph's Hospital's motion be granted.

<h2 align="center">III.</h2>

Dr. Craane and Corizon move for summary judgment and statutory dismissal of Saldana's claims.

### A. Affidavit Requirement

Dr. Craane likewise contends that Saldana has failed to comply with the expert affidavit requirements of Minn. Stat. § 145.682. Saldana alleges that Dr. Craane's failure to inform him of the varicocele embolization procedure "interferes with common sense medical practice." (Compl. ¶ IV.B.) Giving this allegation the benefit of a liberal reading as this Court is bound to do with pro se litigants, the Court construes this to be a claim for medical malpractice against Dr. Craane. Such an allegation will require testimony, however, on the applicable standard of care in treating Saldana's condition and, like Dr. Moore, Saldana has failed to file the requisite affidavit under Minn. Stat. § 145.682 in support of his claim against Dr. Craane.

On June 1, 2012, Dr. Craane demanded that Saldana provide the affidavit of expert review required by Minn. Stat. § 145.682 as part of his Answer to Saldana's Complaint. (Joint & Separate Ans. of Stephen Craane, M.D., and Corizon, Inc. f/k/a Correctional Medical Services, Inc., ¶ XXI, Docket No. 17.) To date, over a year later, Saldana has

not produced the affidavit required by Minn. Stat. § 145.682. Because Saldana has failed to comply with the statute's requirements, this Court must recommend that Saldana's claim for medical malpractice against Dr. Craane be dismissed with prejudice and Dr. Craane's motion for statutory dismissal of this claim be granted.

## B. Deliberate Indifference

Dr. Craane and Corizon move for summary judgment on Saldana's Eighth Amendment claims, arguing that Saldana has failed to establish that they knew of and deliberately disregarded a serious medical need. "Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir. 2007); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). "[T]he facts and the inferences to be drawn from them [are viewed] in the light most favorable to the nonmoving party." *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997).

"The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide inmates with medical care." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Inmates do not, however, have a "constitutional right to receive a particular or requested course of treatment and prison doctors remain free to exercise their independent medical judgment." *Id.* at 1239.

> To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical

needs. This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it.

*Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted). "Mere negligence or medical malpractice . . . are insufficient to rise to a constitutional violation." *Dulany*, 132 F.3d at 1239.

"The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Meuir*, 487 F.3d at 1118; *see also Cramer v. Iverson*, No. 07-725 (DWF/SRN), 2008 WL 4838715, at *3 (D. Minn. Nov. 5, 2008). "Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact." *Schaub*, 638 F.3d 905; *see also Meuir*, 487 F.3d at 1118 ("Whether a person's medical staff deliberately disregarded the needs of an inmate is a factually-intensive inquiry.").

This Court has reviewed Saldana's medical records.[8] These records show that, between June 2009 and Saldana's first surgery in March 2010, Saldana was generally seen by Dr. Craane with complaints of testicular pain approximately once per month. (*See* Aff. of Charles A. Gross, Ex. A, mndoc 50-54, 56-58, 60, 63, Docket No. 47-1.) During this time, Dr. Craane prescribed different medications, both pain relievers and antibiotics, to treat Saldana's condition. (*See id.*) Dr. Craane also ordered an ultrasound

---

[8] This Court is cognizant of the sensitive nature of medical records and the highly personal and private information they contain. Saldana has made his condition public through the allegations of his Complaint and filing of his own medical records on the public docket without seeking to protect their confidentiality. Nevertheless, when appropriate, this Court has summarized the medical information contained in these records in the interest of Saldana's privacy.

to evaluate Saldana's condition and consulted with a specialist, Dr. Moore, in urology. (*Id.* at mndoc 57, 135, 141-43, 146, 240, 243, 245-46, 248, 252-53, 255, 595.)  It was only after these more conservative treatments that Dr. Moore suggested the varicocelectomy.  (*See id.* at mndoc 62, 64, 150, 152.)

Following Saldana's first surgery, Dr. Craane continued to prescribe different pain relievers.  (*See id.* at mndoc 64, 67, 259.)  When Saldana came to Dr. Craane in July 2010 with complaints of testicular pain, Dr. Craane again ordered an ultrasound in light of Saldana's history.  (*Id.* at mndoc 67, 597.)  Dr. Craane saw Saldana in August, September, and October for pain and, given the lack of improvement, Dr. Craane again consulted with Dr. Moore.  (*Id.* at mndoc 68-69.)  Dr. Moore advised Dr. Craane to obtain another ultrasound, which Dr. Craane did.  (*Id.* at mndoc 69, 598.)

When Saldana's condition did not improve by February 2011 and he expressed concern over the persistence of his symptoms, Dr. Craane requested that Saldana be reevaluated by Dr. Moore.  (*Id.* at mndoc 71.)  At some point between mid-February and early April, Saldana was seen by Dr. Moore, who recommended that Saldana undergo another varicocelectomy.  (*See id.*)  When Saldana agreed to the surgery in early April, Dr. Craane filed a request for the procedure and renewed Saldana's pain medication. (*Id.*)  Saldana had this second surgery within 30 days.  (*See id.* at mndoc 73.)

From May through Saldana's third surgery in August, Dr. Craane saw Saldana on a near biweekly basis to address Saldana's persistent pain.  (*See id.* at mndoc 73-77, 271-72.)  Dr. Craane also continued to consult with Dr. Moore regarding Saldana's lack of improvement.  (*Id.* at mndoc 74-76.)  Dr. Craane explained to Saldana that his pain would

likely not be resolved without surgery. (*Id.* at mndoc 76.) During this time, Dr. Craane also obtained an urgent ultrasound with certain indicators to further assess Saldana's condition. (*Id.* at mndoc 74.)

Saldana's third surgery occurred in August. (*See id.* at mndoc 78.) Saldana continued to experience pain following this surgery. (*See id.* at mndoc 78-80.) Dr. Craane prescribed medication and physical therapy for Saldana's pain. (*See id.* at mndoc 273.) Given Saldana's continuing pain, Dr. Craane again consulted with Dr. Moore, who stated that the only remaining option was the removal of Saldana's testicle. (*Id.* at mndoc 79.) Because Saldana did not wish to pursue this option, Dr. Craane continued to prescribe pain relievers. (*See id.* at mndoc 79, 273.)

In October, Saldana was scheduled for a CT scan. (*Id.* at mndoc 80.) Further consultation with Dr. Moore confirmed that removal was the only remaining option. (*Id.*) Dr. Craane noted that there were no other medical options for Saldana and, if the pain continued, Saldana would need to decide whether to proceed with removal. (*Id.*)

When Saldana was still experiencing pain as of March 2012, Dr. Craane gave him a trial prescription for a pain reliever but again advised him that only removal would give him relief. (*Id.* at mndoc 81.)

In support of his motion, Dr. Craane has filed an affidavit documenting the treatment he provided to Saldana, which, like the medical records themselves, shows the pursuit of more aggressive treatment options when conservative remedies proved ineffective. (*See* Dr. Craane Aff. ¶¶ 5-14.)

Although Saldana did not file a traditional response to the motion to dismiss, he filed a number of documents with the Court, including kite communications with corrections staff, an October 2011 radiology report, August and November 2012 progress notes from Dr. Moore, and additional medical records from September, November, and December 2012. (*See* "General Response," Docket No. 72-1.) Collectively, these documents show that, when Saldana complained of continuing pain, staff generally responded by forwarding Saldana's concerns to Dr. Craane and scheduled Saldana to see Dr. Craane. (*See id.* at 2-3, 5-6.) The radiology report, progress notes, and medical records show that Dr. Craane continued to monitor Saldana's condition and consult with Dr. Moore, a urologist. (*See id.* at 16, 18-21, 25-26.)

Assuming for purposes of this motion that Saldana's condition amounted to an objectively serious medical need, the evidence, when viewed most favorably to Saldana, shows that Dr. Craane attempted to treat Saldana's testicular pain on numerous occasions and in a variety of ways, such as modifying medication and consulting with a specialist. Dr. Craane continued to offer Saldana options to treat his pain, reminding him that the pain would not likely be eliminated absent another surgery. "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." *Dulany*, 132 F.3d at 1240. Saldana has produced nothing to show that the treatment provided by Dr. Craane was constitutionally inadequate. *See Meuir*, 487 F.3d at 1119.

Further, while there appears to be no dispute that Dr. Craane did not advise Saldana about the varicocele embolization procedure, (*see* Dr. Craane Aff. ¶¶ 11-12), Saldana does not have a constitutional right to receive a particular course of treatment. *See Dulany*, 132 F.3d at 1239. Moreover, there is no evidence that Dr. Moore, a specialist in this area, had recommended varicocele embolization as a treatment option for Saldana and such recommendation was somehow interfered with by Dr. Craane.

Finally, the record reflects that Saldana's pain medication was discontinued on May 24, 2011, due to diversion issues. It also appears that this decision was made by Dr. Craane as it is initialed "SJC." (*See* Gross Aff., Ex. A, mndoc 269; Dr. Craane Aff. ¶ 13.) Although Saldana refers to "allegations" of diversion in his Complaint, (*see* Compl. ¶ IV.C), Saldana himself admitted to diverting his medication in kite communications with corrections staff and in a visit with Dr. Craane. (*See* Docket No. 72-1 at 10-11, 27; Gross Aff., Ex. A, mndoc 75). The record also reflects, however, that when Saldana saw Dr. Craane two days after the discontinuation of his pain medication due to diversion, Dr. Craane prescribed ice and an extra blanket for Saldana's back as alternative pain relievers. (Gross Aff., Ex. A, mndoc 75.) Thus, notwithstanding the discontinuation of Saldana's pain medication, Dr. Craane was not deliberately indifferent to the pain Saldana was experiencing.

The record reveals that Saldana suffered from a persistent condition that did not respond to more conservative treatment measures and several surgeries. But while Saldana may be frustrated with the results of those attempts or prefer a different course of treatment, the fact that Dr. Craane continued to respond to and provide treatment for his

condition demonstrates that Dr. Craane was not deliberately indifferent to Saldana's medical needs. *See Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir. 1997) (prison doctor's offer for treatment demonstrated doctor was not consciously disregarding prisoner's medical needs). To avoid summary judgment, Saldana "was required to respond to [Dr. Craane's] motion[] with specific factual support for his claims" like any other civil litigant. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001). He has not. Therefore, this Court recommends Dr. Craane's motion for summary judgment on Saldana's deliberate-indifference claim be granted.

## C. ADA

Saldana further claims that, by being indifferent to his medical needs and "interfer[ring] with proper medical care [and] post surgery recovery" Dr. Craane also "demonstrated blatant discrimination in violation of the American[s with] Disabilities Act [, 42 U.S.C. § 12101 *et seq.*, ('ADA')]" because Saldana is a "vulnerable adult" with "a low IQ [and] comprehens[ion] level." (Compl. ¶¶ IV.A, F, V.)

> The separate titles of the ADA focus on separate types of conduct: Title I prohibits discrimination in employment against qualified individuals with disabilities. Title II prohibits "public entities" from excluding disabled individuals from or denying them the benefits of programs, activities, or services, and from otherwise discriminating against them. Title III prohibits discrimination or the denial of "full and equal enjoyment" of goods, services, and other benefits provided by "places of public accommodation" operated by private entities.

*Klinger v. Director, Dep't of Revenue, State of Mo.*, 433 F.3d 1078, 1080 (8th Cir. 2006), *supplemented on rehearing*, 455 F.3d 888 (8th Cir. 2006) (citations omitted). Liberally

construing Saldana's generic allegations of discrimination based on the provision of medical services, Saldana's claim against Dr. Craane could arguably fall under Title II, relating to the provision of medical services in a state prison, or Title III, concerning the services of a health care provider. *See* 42 U.S.C §12181(7)(F) (including private health care providers in definition of public accommodations under Title III); *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009) (stating the provision of medical services at state prisons falls within Title II).

Assuming for purposes of this motion that Plaintiff is a qualified individual under the ADA, Saldana's discrimination claim fails under either Title II or III. Saldana has asserted this discrimination claim against Dr. Craane individually. (*See* Compl. ¶ V.) But, "[i]ndividuals in their personal capacities, however, are not subject to suit under Title II, which provides redress only from public entities." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010). Accordingly, Dr. Craane is not amendable to suit under Title II. *See id.*; *see also Burgess v. Carmichael*, 37 Fed. App'x 288, 292 (9th Cir. 2002) ("Plaintiffs may sue only a 'public entity' for such violations [of Title II], not government officials in their individual capacities.").

Further, Saldana is only seeking monetary damages. (*See* Compl. ¶ V.) "Title III of the ADA does not provide for private actions seeking damages . . . ." *Stebbins v. Legal Aid of Ark.*, No. 12-3981, 2013 WL 2158660, at *1 (8th Cir. May 21, 2013) (per curiam); *see also Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 50 (1st Cir. 2006) ("This unbroken skein of cases makes manifest that money damages are not an option for private parties suing under Title III of the ADA."); *Reeves v. MV Transp., Inc.*, 845 F. Supp. 2d

104, 107 (D. D.C. 2012) (plaintiff could not recover monetary damages under Title III because only injunctive relief is available).  Thus, the relief Saldana seeks is not available under Title III.

Therefore, this Court recommends that summary judgment be granted in favor of Dr. Craane on the ADA claim.

### D. Corizon

Saldana asserts that Corizon was "solely contracted to provide the proper medical trained person[n]el[] to ensure the basic fundamental treatment of medical needs for incarcerated offenders, failed at this obligation" and that this "failure to oversee the administrative adherence of the treatment of [Saldana], and the recovery process, demonstrates the 'deliberate indifference' shown thru and by its staff, i.e., Dr. Stephen Craane."[9]  (Compl. ¶ IV.I.)  In addition, Saldana asserts that Corizon "is by in [sic] large responsible for its staff and those it contract [sic] and the treatment and maltreatment received of [and] by [Saldana]."  (*Id.*)

"A corporation[, such as Corizon,] acting under the color of state law will be held liable under section 1983 for unconstitutional policies, but will not be liable on a respondeat superior theory."  *Smith v. Insley's Inc.*, 499 F.3d 87, 880 (8th Cir. 2007).  Accordingly, to the extent Saldana's pleading can be construed as asserting a claim for vicarious liability against Corizon for the acts of its employees under a respondeat superior theory, such claim is without merit.  *See id.*; *see also Royster v. Nichols*, 698

---

[9] Saldana also alleges that Reid and Dr. Paulson are members of Corizon's staff.  (Compl. ¶ IV.I.)  Saldana has not rebutted the evidence proffered by Reid and Dr. Paulson that they are in fact employed by the DOC.  (*See* Reid Aff. ¶ 1; Dr. Paulson Aff. ¶ 1.)

F.3d 681, 692 (8th Cir. 2012) (stating "respondeat superior is inapplicable to claims under 42 U.S.C. § 1983" (quotation omitted)).

Assuming for the purposes of this motion that Corizon was acting under the color of state law in supplying medical services to Oak Park Heights, the question becomes whether Corizon "has an unconstitutional policy or custom, or an individual representing the company has taken actions which inflict injuries redressable by section 1983." *Smith*, 499 F.3d at 880. As previously stated, Dr. Craane—the individual acting on behalf of Corizon—was not deliberately indifferent to Saldana's medical needs and Saldana's constitutional rights were not violated. Absent an underlying constitutional violation, any claims by Saldana that Corizon did not adequately train or supervise Dr. Craane fail. *See Royster*, 698 F.3d at 693 (failure-to-train and failure-to-supervise claims fail absent underlying constitutional violation). Further, Saldana's pleadings do not assert that Corizon had some sort of unconstitutional policy in place, only that it was not providing properly trained medical personnel or supervising their activities.

Therefore, this Court recommends that summary judgment be granted in favor of Corizon on all claims.

## IV.

Reid and Dr. Paulson move for summary judgment on a variety of grounds, asserting (1) Saldana has failed to exhaust his administrative remedies as part of the prison dispute resolution process; (2) they did not commit the acts that Saldana alleges them to have committed; and (3) Saldana has failed to state a claim under the ADA and RLUIPA. Additionally, Reid and Dr. Paulson move for statutory dismissal on Saldana's

20

medical malpractice claims because he has not complied with the affidavit requirement of Minn. Stat. § 145.682.

Prior to bringing an action under 42 U.S.C. § 1983, a prisoner must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a); *King v. Ia. Dep't of Corr.*, 598 F.3d 1051, 1052 (8th Cir. 2010). Section "1997e(a) requires 'proper' exhaustion, that is, 'a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court.'" *Id.* at 1053 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Hammet v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012) (per curiam). Further, such "grievance procedures must be exhausted even if the relief the inmate seeks under § 1983 was not available through those procedures." *King*, 598 F.3d at 1052. "If exhaustion was not completed at the time of filing, dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003); *see also Barbee v. Corr. Med. Servs.*, 394 Fed. App'x 337, 338 (8th Cir. 2010) (having determined that such claims were unexhausted, district court erred in proceeding to merits of prisoner's claims).

The determination of whether a prisoner has exhausted the available administrative remedies is made "on a case-by-case basis, with each prisoner's Complaint being evaluated in light of its compliance with established prison grievance procedures." *King v. Dingle*, No. 08-cv-5922 (ADM/RLE), 702 F. Supp. 2d 1049, 1065 (D. Minn. 2010) (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)). A defendant bears the burden of "show[ing] that a plaintiff prisoner failed to exhaust all available administrative remedies." *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002); *see also Roth v.*

*Larson*, No. 06-cv-4574 (MJD/JSM), 2008 WL 4527831, at *14 (D. Minn. Sept. 30, 2008).

In support of their contention that Saldana has not exhausted his administrative remedies, Reid and Dr. Paulson cite the affidavits of Kim Ebeling, an Office & Administrative Specialist Senior with the Policy and Legal Services Division of the DOC. (*See* Mem. in Supp. of Summ. J. of Defs. Paulson & Reid at 19-20; Aff. of Kim Ebeling ¶ 1, June 29, 2012, Docket No. 25; Sec. Aff. of Kim Ebeling ¶ 1, Nov. 13, 2012, Docket No. 64.) Ebeling's duties include coordinating grievance appeals within the DOC. (Ebeling Aff. ¶ 1; Sec. Ebeling Aff. ¶ 1.)

In her first affidavit, Ebeling sets forth the DOC grievance procedures, known as DOC Policy 303.100.[10] (Ebeling Aff. ¶¶ 2-3, Ex. A.) Before filing a grievance, prisoners are first required to attempt to resolve the issue informally through the kite system. (Ebeling Aff. Ex. A.) Kite communications involve "a printed form issued by the [DOC] that offenders use to communicate with staff (e.g., ask questions, communicate concerns, request a special visit, request for program information, request for information to transfer, etc.)." (*Id.*) If a prisoner feels the issue has not been resolved through the kite system, he may submit a formal grievance to the facility grievance coordinator. (*Id.*) The formal grievance is to be submitted on a special form and include, among other things, kite communications with staff regarding the issue. (*Id.*) The formal grievance must be filed "within 30 calendar days of occurrence of the issue being grieved." (*Id.*)

_____

[10] The events at issue span multiple years and two versions of the grievance policy. (*See* Ebeling Aff. Ex. A.) Both versions are included in Exhibit A to Ebeling's affidavit. There are no substantive differences between the relevant policies.

The warden or the warden's designee will then respond to the grievance "within 20 working days." (*Id.*) If the prisoner is not satisfied with response, the prisoner may submit an appeal to the Central Office grievance appeal coordinator, which will then be decided by the Commissioner of Corrections or an assistant or deputy commissioner. (*Id.*) "Once a grievance appeal has been resolved by the assistant or deputy commissioner or the Commissioner, there are no further appeals." (*Id.*) Grievances involving medical issues are processed by, or in consultation, with the DOC's medical personnel. (*See* Ebeling Aff. ¶ 4, Ex. A.)

Ebeling avers that claims of inadequate medical care (including inappropriate discharge from transitional care, medication issues, physician requests, and disagreements involving the course of treatment) are properly brought through the grievance procedure outlined in DOC Policy 303.100. (Ebeling Aff. ¶ 4; Sec. Ebeling Aff. ¶ 2.) Ebeling has reviewed the DOC's grievance records and avers that Saldana has not filed any grievance appeals. (Ebeling Aff. ¶ 4; Sec. Ebeling Aff. ¶ 2.)

In his Complaint, Saldana asserts that he followed the prisoner grievance procedure by "[f]il[ing] numerous complaints up the chain of command with final complaint to Dr. Pauls[o]n—Head Administrator of Medical Services." (Compl. ¶¶ II.B, C.1.) Saldana states that his complaints were either denied or ignored. (*Id.* ¶ II.C.2.) While the complaint form instructed Saldana to "[a]ttach a copy of the decision or disposition received from the prisoner grievance procedure," (*Id.* ¶ II.C), Saldana did not attach any documentation to his Complaint. Saldana did, however, submit copies of kite communications with DOC staff as part of his general response to motions filed by all of

the Defendants in this matter. (*See* "General Response" at 1-15, 27-28.) The kites are primarily directed to Reid and "Health Services," and Saldana raises issues with respect to his medication, the allegations that he diverted medication, his discomfort and pain, and his dissatisfaction with the response of medical personnel. (*See id.* at 1-15, 27-28.) In all but one of these kites, medical personnel, including Reid, responded in a variety of ways including scheduling Saldana for a sick call (*id.* at 2, 5, 7-8, 15); reporting his condition to Dr. Craane (*id.* at 5-6); encouraging Saldana to work with Drs. Craane and Moore to have his more specific questions addressed (*id.* at 1, 4, 12-13); and directing Saldana to notify Health Services if his condition changed (*id.* at 3, 10).

While not submitted by Saldana, Reid and Dr. Paulson included copies of two letters Saldana sent to Dr. Paulson, one in 2011 and one in 2012. (*See* Dr. Paulson Aff., Exs. O, P, Docket Nos. 63-7, 10.) The 2011 letter sets forth Saldana's complaints concerning the treatment of his varicocele and constant pain, and was responded to by a Health Services director, who concluded Saldana was receiving appropriate care. (*Id.*, Ex. O.) The 2012 letter reiterated Saldana's continuing pain and requested a narcotic pain reliever. (*Id.*, Ex. P.) Dr. Paulson responded by stating that the requested pain reliever was often prescribed "for pain in the period immediately after surgery" and "not indicated for [the] chronic pain" Saldana is experiencing. (*Id.*)

"Under the plain language of section 1997e(a), an inmate must exhaust administrative remedies before filing suit in federal court. . . . If exhaustion was not completed at the time of filing, dismissal is mandatory." *Johnson*, 340 F.3d at 627; *see also Barbee*, 394 Fed. App'x at 338. Under DOC Policy 303.100, a grievance is not fully

24

exhausted until the prisoner has filed an appeal and that appeal has been resolved by the Commissioner or an assistant or deputy commissioner. (Ebeling Aff. Ex. A.) Stated differently, "the administrative remedies provided by the DOC are fully exhausted for purposes of § 1997e(a) only when an inmate completes all of the prescribed steps of the DOC Grievance Procedure, and receives a final decision from the assistant or deputy commissioner or Commissioner." *Roth*, 2008 WL 4527831, at *15 (discussing DOC Policy 303.100 dated June 6, 2006). Reid and Dr. Paulson have presented evidence that Saldana did not exhaust his remedies under DOC Policy 303.100. Construing all reasonable inferences in favor of Saldana, Saldana's evidence—the kites and his statements that "complaints" were filed, which the Court has evaluated in conjunction with copies of Saldana's letters filed by Reid and Dr. Paulson—show that Saldana sought informal resolution of numerous issues related to his medical care several times but did not pursue these issues by formal grievance. These informal attempts at resolution are not enough. *See King*, 702 F. Supp. 2d at 1067 ("The inmate is still required to institute the formal grievance procedure, following a failure of the informal use of kites that are directed at staff members in order to resolve the inmate's particular issue."); *Roth*, 2008 WL 4527831, at *16 ("Failure to adhere to DOC's sequential grievance process after the sending of the kite to a pertinent staff member is fatal to plaintiff's suit, and substantial compliance or compliance 'in spirit' with this procedure will not excuse plaintiff from the requirements for exhaustion under the P[risoner Litigation Reform Act].").

The Court finds that Saldana has failed to exhaust his administrative remedies. Because Saldana has not exhausted his administrative remedies regarding these claims,

this Court will not proceed to a discussion of their merits. *Barbee*, 394 Fed. App'x at 338. Therefore, this Court recommends that Reid and Dr. Paulson's motion for summary judgment be denied and these claims be dismissed without prejudice[11] for failure to exhaust administrative remedies.

## V.

With the dismissal of Reid and Paulson, all that remains of the DOC defendants, is the DOC itself. As already discussed, *see supra* Part I.B.3., Saldana has not alleged what the DOC did or failed to do. Rule 8 requires more. *See* Fed. R. Civ. P. 8; *Iqbal*, 556 U.S. at 678. But, even with more robust pleading, Saldana's § 1983 claims against the DOC are fundamentally flawed because the DOC is not a person against whom such a claim can be asserted.

As the Eighth Circuit has stated, "[s]ection 1983 provides for an action against a 'person' for a violation, under color of law, of another's civil rights. As the Supreme Court reminded us, 'a State is not a "person" against whom a § 1983 claim for money damages may be asserted.'" *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008) (quoting *Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002)); *see also Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 948 F.2d 1084, 1086 (8th Cir. 1991) ("Section 1983 provides a cause of action against 'persons' only." (quotation omitted)). The DOC is an arm of the State of Minnesota. *See* Minn. Stat. §§ 15.01 (listing state

---

[11] There is an argument to be made for dismissing this matter with prejudice since many of the individual incidents and interactions complained of occurred well over 30 days ago and, under DOC Policy 303.100, the time for filing a grievance has expired. (*See* Ebeling Aff. Ex. A. (requiring a prisoner to file a grievance "within 30 calendar days of occurrence of the issue being grieved"). Saldana has informed this Court, however, that he is scheduled for a fourth surgery for treatment of the same condition. (Docket No. 72 at 2.) For purposes of the present motion, this Court need not draw lines of demarcation in what appears to be a continuing course of treatment.

departments), 241.01 (creation of the DOC); *see also Harris v. McSwain*, 417 Fed. App'x 594, 595 (8th Cir. 2011) (per curiam) (state department of corrections part of state and its agencies for Eleventh Amendment purposes).  Therefore, the DOC is not a person Saldana can sue under § 1983.

Further, "[t]he Eleventh Amendment protects the State, and the arms of the State, from liability for monetary damages in a Section 1983 action."  *King*, 702 F. Supp. 2d at 1070; *see also Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) (Eleventh Amendment bars claims against states and their agencies); *Harris*, 417 Fed. App'x at 595 (same).  Thus, as to the DOC, the relief sought by Saldana is also barred by the Eleventh Amendment.

Therefore, this Court recommends that any claims against the DOC be dismissed pursuant to 28 U.S.C. § 1915A (requiring the court to review prisoner complaints against governmental entities and dismiss those failing to state a claim for relief or where immunity bars monetary relief).

## VI.

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants Steven Moore, M.D., and St. Joseph's Hospital's Motion to Dismiss Pursuant to Minn. Stat. § 145.682 (Docket No. 30) **BE GRANTED**;

2. Stephen Craane, M.D. and Corizon, Inc. f/k/a Correctional Medical Services, Inc.'s Motion for Summary Judgment and Statutory Dismissal (Docket No. 44) **BE GRANTED**;

3. Defendants Paulson and Reid's Motion for Summary Judgment (Docket No. 60) **BE DENIED AND** these claims **BE DISMISSED WITHOUT PREJUDICE**;

4.  Defendant "MN. DOC" **BE DISMISSED**; and

5.  This matter **BE DISMISSED**.


Date: July_____26_____, 2013                              _____*s/ Tony N. Leung*_____
                                                            Tony N. Leung
                                                            United States Magistrate Judge
                                                            for District of Minnesota


                                                            *Saldana v. Crane et al.*
                                                            File No. 12-cv-573 (DWF/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. The Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **August 28, 2013**.